IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEVONNA DENISE MURPHY, | ) | CASE NO. 1:18-cv-02602 |
| | ) | |
| Plaintiff, | ) | JUDGE PATRICIA A. GAUGHAN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff Devonna Denise Murphy ("Plaintiff" or "Murphy") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

On October 8, 2015, Murphy protectively filed applications for DIB and SSI.[1]  Tr. 23, 113, 126, 231-242.  Murphy alleged a disability onset date of September 30, 2015, (Tr. 23, 101,

---

[1] The Social Security Administration explains that "protective filing date" is "The date you first contact us about filing for benefits. It may be used to establish an earlier application date than when we receive your signed application."  http://www.socialsecurity.gov/agency/glossary/ (last visited 10/3/2019).

1

262), based on lupus, fibromyalgia, migraines, high blood pressure, diabetes, and depression (Tr. 101, 159, 170, 267).  After initial denial by the state agency (Tr. 159-165) and denial upon reconsideration (Tr. 170-181), Murphy requested a hearing (Tr. 182-185).  On September 20, 2017, a hearing was held before an Administrative Law Judge ("ALJ").  Tr. 42-78.

On February 6, 2018, the ALJ issued an unfavorable decision (Tr. 20-41), finding that Murphy had not been under a disability within the meaning of the Social Security Act from September 30, 2015, through the date of the decision (Tr. 24, 34).  Murphy requested review of the ALJ's decision by the Appeals Council. Tr. 224-229.  On September 10, 2018, the Appeals Council denied Murphy's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

### A.    Personal, educational, and vocational evidence

Murphy was born in 1973.  Tr. 48, 127, 241.  At the time of hearing, Murphy lived in an apartment with her son who was seven years old.  Tr. 48-49.  She graduated from high school and attended some college.  Tr. 48.  Murphy received an STNA in phlebotomy but her license had lapsed.  Tr. 48.  Murphy last worked in 2015 as an STNA.  Tr. 49-50.  Murphy also worked in the past at Taco Bell and at a school performing custodial work.  Tr. 50-51, 73.

### B.    Medical evidence

#### 1.  Treatment history

On September 17, 2015, Murphy saw Susan P. Mathai, M.D., a rheumatologist at the Cleveland Clinic to establish care because she had moved.  Tr. 510-513.  Murphy relayed that she had recently been diagnosed with SLE (systemic lupus erythematosus).  Tr. 510.  Murphy also had a new diagnosis of iritis.  Tr. 513.  Murphy's prior rheumatologist had started her on an

oral steroid and MTX (Methotrexate).  Tr. 510.  Murphy reported diffuse myalgias; inability to sleep due to pain in her arms; fatigue; and limited ability to drive because she was sleepy during the day due to lack of sleep at night.  Tr. 510.  Murphy reported that she was always tired a lot but had never been as tired as she was at that time and she could not even lift a gallon of milk due to the pain and weakness in her muscles.  Tr. 510.  On physical examination, Dr. Mathai observed that Murphy had a normal gait and station and all her joints were normal without pain, tenderness, swelling, deformity/subluxation, and full range of motion except it was noted that Murphy was heavily built and nourished and ambulated slowly and stiffly.  Tr. 512.  Murphy's muscle strength and tone seemed normal and there was no decreased muscle mass.  Tr. 512. There was pain on palpation in the bilateral upper arms.  Tr. 512.  Murphy had 5/5 strength in the bilateral upper and lower extremities.  Tr. 512.  All tender points were present.  Tr. 512.  There was no active synovitis.  Tr. 512.  Dr. Mathai was not certain that there was a systemic inflammatory process occurring but planned to check Murphy's labs.  Tr. 513.  Dr. Mathai continued Murphy on MTX and planned to obtain her old records.  Tr. 513.  Dr. Mathai prescribed Imuran for Murphy's recurrent iritis.  Tr. 513.

On September 28, 2015, Murphy started to see Jason D. Ridgel, M.D., as her primary care physician.  Tr. 635-637.  During her office visit, Murphy reported decreased energy level and poor sleep.  Tr. 635.  Murphy's diabetes was discussed.  Tr. 635.  She reported current symptoms of blurred vision, numbness and tingling in her fingers and toes, increased appetite, weight gain and foot problems.  Tr. 635.  On physical examination, Murphy had normal sensation, reflexes, posture and gait.  Tr. 636.  Dr. Ridgel indicated that Murphy's diabetes was well controlled at the time.  Tr. 637.  Dr. Ridgel discussed Murphy's other impairments, including hypothyroid, hyperlipidemia, hypertension, autoimmune disease, GERD, and migraine

headaches.  Tr. 637.  With respect to Murphy's autoimmune disease, Dr. Ridgel noted that Murphy was being seen by a rheumatologist.  Tr. 637.

Murphy saw Dr. Mathai on October 22, 2015, for follow up regarding her SLE.  Tr. 535-538.  Following Dr. Mathai's review of Murphy's lab work, Dr. Mathai changed Murphy's diagnoses to inflammatory arthritis, uveitis and fibromyalgia, noting that she suspected fibromyalgia and depression.  Tr. 535.  On physical examination, muscle strength and tone seemed normal and there was no decreased muscle mass.  Tr. 537.  Murphy had a normal gait and station.  Tr. 537.  Murphy was tender to touch all over – her joints and muscles were tender to touch.  Tr. 537.  Murphy had good strength in her upper and lower extremities.  Tr. 537.  Murphy reported she was achy all over; her joints and muscles hurt; and she continued to have severe fatigue.  Tr. 537.  Dr. Mathai prescribed depomedrol for Murphy's aches and pains and added Cymbalta, noting that fibromyalgia was suspected and Murphy was depressed as well.  Tr. 537.  Dr. Mathai referred Murphy to a headache clinic for chronic headaches.  Tr. 537.

During a psychological consultative examination in January 2016, although Murphy reported her whole body hurt, the examiner noted no physical symptoms or displays of pain or discomfort.  Tr. 703.

On February 26, 2016, Murphy was seen at the headache clinic by Dr. Emad Estemalik, M.D.  Tr. 918-922.  On physical examination, Dr. Estemalik observed normal muscle tone, strength and sensation, no evidence of atrophy, and a normal gait.  Tr. 921.  Murphy was alert, her affect and speech were normal, and her attention span and concentration were good.  Tr. 921.  Dr. Estemalik indicated that Murphy had ongoing chronic migraines.  Tr. 922.  However, Dr. Estemalik indicated that, "[g]iven her medical issues, I don't think there is room to add more medication."  Tr. 922.  Dr. Estemalik planned to seek approval for Botox injections for Murphy's

chronic headaches.  Tr. 922.  In March 2016, Murphy's insurance company notified Dr. Ridgel that it would not approve the request for Botox.  Tr. 945-948.

Murphy saw Dr. Mathai for follow up on March 2, 2016, regarding her joint and muscle pain.  Tr. 810-813.  Murphy reported that her joint and muscle pain was worse in her left leg. Tr. 810.  She denied back pain or pain in her left hip.  Tr. 810.  On physical examination, Dr. Mathai observed a normal gait and station and Murphy's joints were normal without pain, tenderness, deformity/subluxation and with full range of motion. Tr. 812.  Murphy did not feel the Cymbalta was helping.  Tr. 813.  Dr. Mathai increased Murphy's dose of Cymbalta and continued her on MTX and Imuran.  Tr. 813.

On April 20, 2016, Murphy sought emergency room treatment for right arm pain.  Tr. 1031-1037.  The next day, Murphy saw Dr. Ridgel for complaints of urinary problems and pain in her right arm that had been persistent for about a month.  Tr. 1288.  Murphy described her pain as constant stabbing in her right upper arm.  Tr. 1288.  Dr. Ridgel treated Murphy for an acute urinary tract infection.  Tr. 1289.  Murphy saw Dr. Ridgel later that same month on April 27, 2016, for routine diabetes management.  Tr. 1290.  During that visit, Murphy continued to report pain in her right arm.  Tr. 1290.  Murphy was also having pain in her left arm but it was not as bad as in her right arm.  Tr. 1290.  There was no associated tingling or numbness.  Tr. 1290.  Murphy relayed that her pain was constant and aching and she reported multiple body pains that were so severe that she had to stop walking to calm down and she could not climb the stairs in her home without taking a break due to the pain.  Tr. 1290.  On physical examination, Dr. Ridgel observed normal strength, tone, and sensation.  Tr. 1290.  Murphy had decreased range of motion in the cervical spine that was severe on extension and rotation but okay on flexion.  Tr. 1290.  There was no tenderness to palpation, no swelling, no edema or erythema, no

palpable step off and no muscle spasticity.  Tr. 1290.  Physical examination of Murphy's arms bilaterally showed full active and passive range of motion; no heat, swelling, redness, or tenderness; and no pain/weakness on abduction, internal rotation or external rotation.  Tr. 1290. Dr. Ridgel ordered x-rays to assess for degenerative joint disease.  Tr. 1291.

    X-rays were taken on April 29, 2016, to assess Murphy's neck pain and range of motion limitations.  Tr. 1293.  During a May 23, 2016, visit, Dr. Ridgel indicated that the x-rays confirmed calcinosis and tendinopathy of the shoulder.  Tr. 1293.  The cervical spine x-ray findings were suggestive of DISH.[2]  Tr. 1293.  Dr. Ridgel indicated that the cervical spine x-ray did not show foraminal stenosis so Dr. Ridgel thought that cervical radiculopathy was unlikely. Tr. 1293.  A physical examination showed normal strength, tone and sensation and no tenderness, swelling, edema, erythema, palpable step off, or muscle spasticity in the cervical spine but there was decreased cervical range of motion.  Tr. 1292.  Murphy exhibited severe limitation with extension and rotation but flexion was okay.  Tr. 1292.  Physical examination of the bilateral shoulders/arms showed pain/weakness on abduction, internal rotation, external rotation, and decreased range of motion (inability to fully rotate both arms internally or externally).  Tr. 1292.  Murphy also had a positive empty can test.[3]  Tr. 1292.  Dr. Ridgel recommended a steroid tendon injection to reduce Murphy's pain and he recommended obtaining an opinion from orthopedics.  Tr. 1293.

---

[2] "Diffuse idiopathic skeletal hyperostosis (DISH) is a bony hardening of ligaments in areas where they attach to your spine. . . .this condition might not cause symptoms or require treatment.  If it does cause symptoms, the most common are mild to moderate pain and stiffness in your upper back.  DISH can also affect your neck and lower back, and some people have DISH in other areas, such as shoulders, elbows, knees and heels.  DISH can be progressive.  As it worsens, it can cause serious complications."  https://www.mayoclinic.org/diseases-conditions/diffuse-idiopathic-skeletal-hyperostosis/symptoms-causes/syc-20371661 (last visited 10/3/2019).

[3] An empty can test is "[a]n orthopedic test of the shoulder, used to determine the integrity of the supraspinatus muscle."  https://medical-dictionary.thefreedictionary.com/empty+can+test (last visited 10/3/2019).

Upon Dr. Ridgel's referral, Murphy saw Mehrun K. Elyaderani, M.D., at Orthopaedic Associates, Inc. on June 15, 2016 for bilateral arm pain and weakness. Tr. 1269-1271. Murphy relayed that she had fibromyalgia and lupus. Tr. 1269. Murphy rated her pain as an 8/10 and indicated that the pain was unbearable at night. Tr. 1269. The pain did not radiate and there were no aggravating or alleviating factors. Tr. 1269. In addition to her arm pain, Murphy reported pain throughout her body, including in her legs, back and neck. Tr. 1269. Dr. Elyaderani's physical examination was focused on Murphy's upper extremities because that was the focus of Murphy's problem. Tr. 1270. The examination findings included pain and discomfort in the shoulders bilaterally (right worse than the left); pain against resisted range of motion; pain with stretching; and some early capsulitis. Tr. 1270. Dr. Elyaderani noted that Murphy's left shoulder was not as bad as her right. Tr. 1270. Dr. Elyaderani assessed bursitis of the right shoulder. Tr. 1271. Dr. Elyaderani recommended physical/occupational therapy and a steroid injection. Tr. 1270. Murphy was interested in proceeding with therapy and Dr. Elyaderani administered the steroid shot in Murphy's right shoulder. Tr. 1270-1271. Dr. Elyaderani noted that if Murphy wanted to address other issues, e.g., her knees, she should schedule a new patient visit with Dr. Elyaderani or another physician in their group. Tr. 1271.

Murphy saw Dr. Mathai for follow up regarding her joint and muscle pain on June 16, 2016. Tr. 1232-1234. Murphy relayed she had received a right shoulder injection for tendonitis and calcium build up. Tr. 1232. That day, Murphy was experiencing pain in her bilateral arms and legs. Tr. 1232. She also reported stiffness in the mornings for about 30-45 minutes. Tr. 1232. Physical examination findings were normal. Tr. 1234. Dr. Mathai continued Murphy's medications. Tr. 1234.

A few days later, on June 21, 2016, Murphy saw Victor P. Strimbu, M.D., at Orthopaedic Associates, Inc. for evaluation of her right knee pain.  Tr. 1272-1274.  Murphy reported severe pain in her knee which had been present for months.  Tr. 1272.  Murphy explained that her pain was aggravated by going up and down stairs and movement.  Tr. 1272.  Murphy thought there was some swelling and there was some clicking and popping but no locking or giving way.  Tr. 1272.  Physical examination of the knee revealed trace effusion, tenderness, 5/5 strength in flexion and extension; intact sensation to fine touch; and trace patellofemoral crepitus with range of motion in flexion and extension.  Tr. 1273.  Dr. Strimbu obtained x-rays of the right knee.  Tr. 1273.  Dr. Strimbu's assessment was early patellofemoral arthropathy with patellar malalignment.  Tr. 1274.  He also noted that meniscal pathology could not be ruled out.  Tr. 1274.  Dr. Strimbu discussed treatment options, which included anti-inflammatories, injections, therapy, and bracing.  Tr. 1274.  Murphy was not interested in a brace but was interested in trying physical therapy.  Tr. 1274.  Since Murphy had recently had a cortisone injection for her shoulder, Dr. Strimbu did not recommend an injection at the time.  Tr. 1274.

Murphy saw Dr. Mathai on August 17, 2016, for an urgent visit due to vomiting and nausea.  Tr. 1235-1238.  She reported being dizzy and fatigued a lot.  Tr. 1235.  She had not started any new medication.  Tr. 1235.  Her joint pain was stable.  Tr. 1235.

Murphy saw Dr. Ridgel later that month on August 24, 2016, for continued complaints of nausea and vomiting.  Tr. 1296.  She also reported headaches, diarrhea, severe body pain and fatigue.  Tr. 1296.  Murphy relayed that she was unable to walk one flight of stairs without stopping and could walk no further than one city block without stopping.  Tr. 1296.  Murphy was unable to lift more than 1 gallon of milk without assistance due to weakness.  Tr. 1296.  She had no problems sitting or lying down.  Tr. 1296.  She had no problems with dexterity but she could

8

not grip repeatedly.  Tr. 1296.  Physical examination findings were normal.  Tr. 1296.  Dr.
Ridgel indicated that Murphy was applying for disability because she felt that her weakness and
body pain inhibited her from performing sustained work.  Tr. 1296.

On October 8, 2016, Murphy was admitted to hospital following a visit to the emergency
room for left arm pain, starting at the shoulder and going down the whole arm.  Tr. 1425.  The
pain was noted to be sharp and worse with movement but there was no numbness, tingling or
weakness.  Tr. 1425.  Murphy reported joint stiffness in both shoulders lasting about 30 minutes.
Tr. 1425.  Physical examination findings associated with an orthopedic consultation during
Murphy's hospital stay included some abnormal findings, i.e., decreased range of motion in the
neck and shoulders and some tenderness.  Tr. 1477.  Murphy's gait was normal and she could
walk on heels and toes.  Tr. 1477.  An x-ray of the left shoulder was normal.  Tr. 1478.  The
consulting orthopedic physician, Robert Berkowitz, M.D., assessed left shoulder pain, noting that
he felt it was likely more of a shoulder problem than a neck problem.  Tr. 1478.  Dr. Berkowitz
indicated that there was the possibility of radiculopathy but that was less likely.  Tr. 1478.  He
recommended physical therapy to treat the shoulder.  Tr. 1478.  With the exception of
degenerative disc changes with bulky osteophytes showing as present at the C4-C7, a cervical x-
ray taken during Murphy's hospital stay showed no abnormalities.  Tr. 1301.  Murphy was
discharged on October 10, 2016, with diagnoses of left arm pain, hypertension, diabetes mellitus,
hyperlipidemia, hypothyroidism, history of pulmonary embolism, and history of rheumatoid
arthritis and fibromyalgia.  Tr. 1425.  Murphy was advised to follow up with her primary care
physician and ortho.  Tr. 1426.  She was also advised not to raise the affected arm above chest
level.  Tr. 1426.

Following her discharge from the hospital, Murphy saw Dr. Ridgel on October 13, 2016, for follow up.  Tr. 1300.  Dr. Ridgel's physical examination of Murphy's left shoulder revealed pain with abduction above 90 degrees and Murphy's neck was stiff with lots of muscle spasms and tender throughout.  Tr. 1300.  Murphy then saw Dr. Mathai on October 24, 2016, for follow up.  Tr. 1239-1242.  Murphy relayed that her pain level in her left arm and neck was an 8/10.  Tr. 1239.  Murphy had not tried Neurontin for pain.  Tr. 1239.  Murphy reported numbness and tingling in her left arm and reported numbness and tingling in her legs.  Tr. 1239.  Examination findings were normal.  Tr. 1241.  Murphy did not feel that Cymbalta was helping much but Dr. Mathai continued Murphy on Cymbalta.  Tr. 1242.  Dr. Mathai also started Murphy on a low dose of Neurontin.  Tr. 1242.

On January 3, 2017, Murphy sought emergency room treatment for pain in her left arm. Tr. 1120-1126.  Review of systems was negative for back pain, joint swelling, neck pain or neck stiffness.  Tr. 1122.  On physical examination, Murphy exhibited normal range of motion.  Tr. 1124.  She had pain and tenderness located in the bicep area.  Tr. 1124.  Murphy had a good bilateral hand grip.  Tr. 1125.  On discharge, Murphy was diagnosed with bicep tendonitis on the left and fibromyositis.  Tr. 1126.  She was instructed to follow up with Dr. Ridgel.  Tr. 1126.

Upon Dr. Mathai's recommendation, on January 17, 2017, Murphy saw Santhosh A. Thomas, D.O., MBA, for a consultation regarding her neck pain that was radiating to her left shoulder and down into her left arm and hand with numbness and tingling.  Tr. 1243-1247.  Dr. Thomas observed a wide gait.  Tr. 1246.  Murphy's sensation was grossly intact to superficial light touch to the bilateral upper extremities.  Tr. 1246.  Murphy had good to normal muscle strength in the biceps, triceps, anterior and lateral deltoids, wrist flexors, wrist extensors, and hand intrinsics on the right side but the left side was limited due to pain and range of motion

10

limitations.  Tr. 1246.  Murphy had no significant loss of range of motion in cervical flexion,
extension or rotation.  Tr. 1246.  Her shoulder range of motion was within functional limits on
the right but significantly limited and painful in the left shoulder.  Tr. 1246.  No gross muscle
atrophy or asymmetry noted in the bilateral upper extremities.  Tr. 1246.  There was no
significant reproduction of pain with palpation of the cervical paraspinous muscles bilaterally
and pain with palpation of the trapezius was mild.  Tr. 1246.  Dr. Thomas noted that Murphy
appeared to have some signs of adhesive capsulitis.  Tr. 1247.  He recommended that Murphy
start therapy for her shoulder and obtain cervical spine x-rays and a cervical spine MRI.  Tr.
1247.

On January 27, 2017, Murphy had an initial physical therapy evaluation.  Tr. 1152-1155.
Murphy attended 11 physical therapy sessions and then took a break to await recommendations
from her neurosurgeon regarding possible surgery.  Tr. 1156-1194.  The neurosurgeon
recommended that Murphy continue with physical therapy so Murphy resumed physical therapy
sessions through June 2017 when she was discharged with instructions for home exercises.  Tr.
1194-1230.

In February 2017, Murphy saw Katie Evanchick, a physician assistant with Dr. Thomas'
department, for follow up.  Tr. 1248-1251.  Murphy reported chronic pain with worsening left
upper extremity radicular pain notwithstanding conservative management.  Tr. 1250.  Ms.
Evanchick observed no significant new antalgic gait and no new motor weaknesses in the
bilateral quads.  Tr. 1250.  A cervical MRI taken on February 3, 2017, showed multilevel
degenerative changes most pronounced at C7-T1, mild canal stenosis, and facet and ligamentum
flavum hypertrophy at T1-T2 with mild right foraminal stenosis.  Tr. 1251.  Ms. Evanchick's
assessment was bilateral shoulder pain with unspecified chronicity; degeneration of

11

intervertebral disc of mid-level cervical region with unspecified spinal level; and radiculopathy, cervical region.  Tr. 1251.  Ms. Evanchick prescribed a Medrol dose pack and instructed Murphy to continue with physical therapy and Neurontin.  Tr. 1251.  Shoulder x-rays and an EMG were ordered.  Tr. 1251.

On March 9, 2017, Murphy saw a spine surgeon Gandhivarma Subramaniam, M.D. for her neck and left upper extremity pain.  Tr. 1252-1256.  Murphy also reported right arm pain but indicated that her left arm was much worse.  Tr. 1252.  Murphy denied having trouble ambulating.  Tr. 1252.  Her pain level was an 8 out of 10.  Tr. 1252.  Dr. Subramaniam's neurological examination showed that Murphy's neck motion was minimally restricted due to pain; there was no motor or sensory deficit; her reflexes were sluggish and there was no Hoffmann or clonus.  Tr. 1255.  Dr. Subramaniam indicated that the cervical spine MRI showed degenerative changes at multiple levels, a small central disc herniation at C7-T1 level with a mild right-sided foraminal stenosis.  Tr. 1255.  There was no spinal cord compression and the EMG was normal.  Tr. 1255.  Dr. Subramaniam recommended exercises and pain medication for Murphy's neck and arm pain.  Tr. 1256-1257.  Dr. Subramaniam did not feel that surgical intervention was required for the small central disc herniation at C7-T1.  Tr. 1257.

Murphy also saw Dr. Mathai on March 9, 2017, for follow up regarding her joint pain. Tr. 1257-1260.  Murphy continued to report arm pain. Tr. 1257.  Physical examination findings were normal.  Tr. 1259-1260.  Murphy had to cut back on Imuran and MTX because of blood work showing high liver functions.  Tr. 1257.  Dr. Mathai recommended that Murphy switch to Lyrica to see if it helped with controlling her pain.  Tr. 1260.  Dr. Mathai planned to reassess Murphy's blood work later that month.  Tr. 1260.

On April 12, 2017, Murphy saw Dr. Thomas for follow up.  Tr. 1261-1265.  Murphy reported that she was having a hard time with her left shoulder.  Tr. 1264.  Dr. Thomas indicated that it appeared Murphy had some component of adhesive capsulitis.  Tr. 1264.  Dr. Thomas also assessed uncontrolled type 2 diabetes with neuropathy, cervical spondylosis without myelopathy, pain of both shoulder joints, and low back pain, non-specific.  Tr. 1264.  Dr. Thomas recommended an endocrine consultation for her diabetes.  Tr. 1264.  He also recommended that Murphy try physical therapy again for her shoulder.  Tr. 1264.

On April 14, 2017, Murphy returned to see Dr. Estemalik regarding her headaches.  Tr. 1266-1268.  Dr. Estemalik continued to recommend Botox injections for treatment of Murphy's headaches,[4] explaining that Murphy had more than 25 headaches per month, lasting four or more hours with associated photophobia, phonophobia, and nausea and Murphy had tried multiple medications without success.  Tr. 1268.

During an office visit with Dr. Ridgel  on June 19, 2017, for routine diabetes management, Murphy reported numbness and tingling in her toes and foot problems.  Tr. 1318.  Dr. Ridgel noted 1+ pitting edema of the leg.  Tr. 1318.  Otherwise, physical examination findings were unremarkable.  Tr. 1318.

### 2.  Opinion evidence

*Treating source opinions*

### ***Dr. Ridgel***

On August 24, 2016, Dr. Ridgel completed a Medical Source Statement: Physical Abilities and Limitation.  Tr. 1017-1018.  Dr. Ridgel opined that Murphy could work 1 hour on a typical day, stating that Murphy was limited due to pain and fatigue/weakness.  Tr. 1017.  Dr.

---

[4] At the hearing on September 20, 2017, Murphy testified that she had received an injection.  Tr. 67.

Ridgel opined that, due to weakness and debilitating pain, Murphy would likely be absent from work 3 or more days per month.  Tr. 1017.  Dr. Ridgel opined that Murphy had difficulty standing/walking because of pain and weakness and she could stand/walk for 30 minutes at one time and stand/walk for a total of 1 hour in an 8-hour period with intermittent breaks.  Tr. 1017.  Dr. Ridgel opined that Murphy had difficulty sitting and must change positions frequently.  Tr. 1017.  Dr. Ridgel opined that Murphy could sit for 60 minutes at one time and could sit for a total of 8 hours in an 8-hour period with intermittent breaks.  Tr. 1017.  Dr. Ridgel opined that Murphy was limited to lifting and carry 5 pounds occasionally and 2 pounds frequently.  Tr. 1018.  Dr. Ridgel opined that Murphy had no problems fingering, handling or reaching.  Tr. 1018.  At the end of the report, Dr. Ridgel commented that Murphy "exhibits very poor exercise tolerance needing to rest after walking a single city block."  Tr. 1018.

### *Dr. Mathai*

On February 15, 2017, Dr. Mathai provided a letter stating that Murphy was under her care for recurrent Iritis and Systemic Lupus.  Tr. 1571.  Dr. Mathai indicated that Murphy had other comorbidities such as diabetes, hypertension, high cholesterol, hypothyroidism, and obesity.  Tr. 1571.  Dr. Mathai stated "D[ue] to [Murphy's] multiple medical conditions she is not able to work.  Please consider her for disability."  Tr. 1571.

On August 14, 2017, Dr. Mathai, provided a statement wherein she indicated she had reviewed Dr. Ridgel's "Medical Source Statement" dated 8/24/2019 and checked a box indicating she agreed with and adopted the findings.  Tr. 1569.  Dr. Mathai stated she had first examined Murphy on September 17, 2015, and last examined her on March 9, 2017.  Tr. 1569.  No comments were provided under the "other comments," section.  Tr. 1569.

*State agency reviewing opinions*

On January 13, 2016, state agency reviewing physician Anne Prosperi, D.O., completed a physical RFC Assessment.  Tr. 108-110.  Dr. Prosperi opined that Murphy had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push and/or pull unlimitedly other than as indicated for lifting and/or carrying.   Tr. 108-109.  As explanation for the exertional limitations, Dr. Prosperi indicated that Murphy was obese; she had been treated for lupus and suspected fibromyalgia; cervical and lumbar x-rays showed some degenerative changes; examinations showed a normal gait; there were diffuse tender points present; Murphy had some decreased range of motion in her spine; there was good joint range of motion without synovitis; there was intact sensation and reflexes; and "strength [was] 5/5 t/o." Tr.  109.  Dr. Prosperi opined that Murphy would be limited to frequently climbing ramps/stairs; frequently climbing ladders/ropes/scaffolds; frequently stooping; frequently kneeling; frequently crouching; and frequently crawling.  Tr. 109.  Also, Murphy would have to avoid concentrated exposure to extreme cold and heat and avoid even moderate exposure to hazards (machinery, heights, etc.).  Tr. 110.

Upon reconsideration, on April 28, 2016, state agency reviewing physician Abraham Mikalov, M.D., completed a Physical RFC Assessment, reaching the same opinions as Dr. Prosperi.  Tr. 137-139.

**C.**     **Hearing testimony**

**1.**     **Plaintiff's testimony**

Murphy testified and was represented at the hearing.  Tr.  44, 47-71, 73.  When the ALJ asked Murphy why she felt she was disabled, Murphy stated, "Because I know I can't do anything."  Tr. 51.  She indicated she could not really lift anything, explaining she has to use both hands to lift a gallon of milk.  Tr. 51.  She can only walk up one flight of stairs before she has to stop to take a break because her legs are tired.  Tr. 51.  She is tired a lot.  Tr. 51.  Her arms, legs, and back hurt her a lot.  Tr. 51.  She has migraines.  Tr. 51.  She had recently had a shot for her migraines but could not go back for about six weeks because pre-approval was required.  Tr. 51.  She was recently in the emergency room because of her lupus – it had attacked her colon causing colitis.  Tr. 51.  Murphy also indicated she cannot sit or stand very long without having to get up and move around or sit and take a break.  Tr. 52.  Murphy explained she could not work because she would constantly be off work because something is always wrong with her.  Tr. 51-52.

Murphy has pain in her back that she rated a 6 out of 10 at the time of hearing.  Tr. 53.  She indicated that that day was a good day and her pain can sometimes shoot up to a 9 or 10.  Tr. 53.  She has numbness and tingling in her legs about three or four times per month, which Murphy indicated was related to her diabetes.  Tr. 53, 71.  She has numbness and tingling in her arms which makes it very difficult for her to lift things.  Tr. 54.  Murphy has migraines about every other day.  Tr. 55.  The shots have helped with her migraines some – she used to get migraines every day.  Tr. 55.  When Murphy has a migraine, she usually has to sit in her recliner and do nothing.  Tr. 55.

Murphy stated she was diagnosed with lupus in 2014 and Methotrexate is the main medication that she takes for it.  Tr. 55-56.  She could not remember all the medication that she took.  Tr. 55.  Lupus makes Murphy really tired.  Tr. 56.  Also, lupus attacks different organs.

Tr. 56.  She referred to her recent colon attack as an example, which she described as being pretty bad.  Tr. 56.  Murphy explained that lupus has also caused her problems with her vision. Tr. 63.  She has had recurrent iritis and she has also had cataracts.  Tr. 63-64.  The iritis makes it difficult for Murphy to see and it causes bad headaches.  Tr. 63.

Murphy's medications make her tired so she does not drive a lot.  Tr. 57-58.  She does drive to her doctor appointments and she drives her son to school and drives to pick him up from school.  Tr. 58.  When picking her son up from school, Murphy's boyfriend rides with her.  Tr. 58.  It takes Murphy about 15 minutes to take her son to school.  Tr. 58.

Murphy estimated being able to stand for about 15 or 20 minutes before her lower back and legs start to hurt and she needs to sit down.  Tr. 58.  She has to sit down for about 20 to 30 minutes before she can get back up.  Tr. 58.  Murphy estimated her ability to walk is about the same as her ability to stand.  Tr. 59.  She noted that she is a very slow walker.  Tr. 59.  She has never tried using a cane.  Tr. 59.  Murphy can sit for about 20 to 30 minutes before she has to get up and move around.  Tr. 60.  She has to move around for about 20 minutes before she can sit back down.  Tr. 60.

Murphy has problems reaching with her left arm.  Tr. 60.  She indicated she was diagnosed with frozen shoulder.  Tr. 61.  Murphy attended physical therapy for her shoulder.  Tr. 61, 62.  Murphy can reach up with her left arm but only a little bit and she cannot reach backwards at all with her left arm.  Tr. 61.

Murphy has arthritis affecting her knees, back, shoulders and neck.  Tr. 62, 63, 65. Murphy has pain in her hips that comes from her back.  Tr. 62.  She cannot bend over completely.  Tr. 62.  She has had problems with her knees and has received a cortisone shot in her knee.  Tr. 63.  Murphy has been advised to lose weight.  Tr. 63.  She indicated that Dr.

Mathai also indicated that there is a lot of arthritis in her knees.  Tr. 63.  Murphy has little

movement in her neck.  Tr. 66.  She has tried therapy for her neck problems.  Tr. 66.

### 2.    Vocational expert's testimony

Vocational Expert Lanell Hall ("VE") testified at the hearing.  Tr. 71-77.  The VE

described Murphy's past work as follows – home attendant, a medium, SVP 3[5] job performed by

Murphy at the heavy exertion level; fast food worker, a light, SVP 2 job performed by Murphy at

the medium exertion level; and commercial cleaner, a heavy, SVP 2 job performed by Murphy at

the medium exertion level.  Tr. 73.

For his first hypothetical, the ALJ asked the VE to assume a hypothetical individual with

Murphy's past work who is limited to light work and who can frequently climb ramps or stairs;

frequently climb ladders, ropes or scaffolds; frequently stoop, kneel, crouch or crawl; frequently

reach overhead with the left upper extremity; must avoid concentrated exposure to extreme cold

and extreme heat; and must avoid even moderate exposure to hazards such as unprotected

heights, moving machinery, and commercial driving.  Tr. 74.  The VE indicated that the

described individual could perform Murphy's past work as a fast food worker as generally

performed but not as performed by Murphy.  Tr. 74.  The VE indicated that there were also other

jobs that the described individual could perform, including (1) housekeeping cleaner; (2) cashier

II; and (3) mail clerk.  Tr. 74.  The VE provided job incidence data for each of the identified

jobs.  Tr. 74.

---

[5] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation. Social Security Ruling No. 00-4p, 2000 WL 1898704, *3 (Dec. 4, 2000).  "Using the skill level definitions in 20 CFR 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2; semi-skilled work corresponds to an SVP of 3-4; and skilled work corresponds to an SVP of 5-9 in the DOT."  *Id.*

For his second hypothetical, the ALJ asked the VE to consider the first hypothetical but to consider that the individual is limited to sedentary work. Tr. 75. The VE indicated that Murphy's past work exceeded the sedentary exertion but there were other jobs that the individual could perform, including (1) order clerk; (2) document preparer; and (3) touch-up screener. Tr. 75. The VE provided job incidence data for each of the identified jobs. Tr. 75.

For his third hypothetical, the ALJ asked the VE to consider an individual who would be off task 20% of the time. Tr. 75. The VE indicated that such a limitation would be work preclusive, noting that anything greater than 10% or more per day would be work preclusive. Tr. 76.

For this fourth hypothetical, the ALJ asked the VE to consider an individual who would be absent two times per month on an ongoing basis. Tr. 76. The VE explained that anything more than one day per month or more than eight times per year would be work preclusive. Tr. 76.

Murphy's counsel asked the VE to consider an individual who can stand and walk 30 minutes at one time and stand and walk for 1 hour total in an 8-hour period; sit for 60 minutes at one time but can sit for 8 hours total in an 8-hour period with intermittent breaks; and can lift and carry only 5 pounds occasionally and 2 pounds frequently. Tr. 76-77. The VE indicated that the restrictions are below the sedentary exertion level so there would be no jobs available. Tr. 77.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

> 1. If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2. If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.
>
> 3. If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.
>
> 4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work.  If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.
>
> 5. If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 404.1520;[6]  *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d 119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps

---

[6] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq.,

One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The

burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

### IV. The ALJ's Decision

In his February 6, 2018, decision, the ALJ made the following findings:[7]

1.  Murphy meets the insured status requirements of the Social Security Act through June 30, 2019.  Tr. 25.

2.  Murphy has not engaged in substantial gainful activity since September 30, 2015, the alleged onset date.  Tr. 25.

3.  Murphy has the following severe impairments: systemic lupus erythematosus (SLE), fibromyalgia, essential hypertension, diabetes mellitus, and obesity. Tr. 25-26.  Murphy had non-severe mental and physical impairments, including migraines, pulmonary embolism, recurrent iritis, degenerative changes in the cervical and lumbar spine, shoulder bursitis, knee and bilateral hip osteoarthritis, and depressive disorder.  Tr. 26-27

4.  Murphy does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  Tr. 27-29.

5.  Murphy has the RFC to perform sedentary work as defined in 20 C.F.R. § 404.1567(a) except she can frequently climb ramps or stairs; frequently climb ladders, ropes or scaffolds; frequently stoop, kneel, crouch or crawl; frequently reach overhead with the left upper extremity; must avoid concentrated exposure to extreme cold and extreme heat; must avoid even moderate exposure to hazards such as unprotected heights, moving machinery and commercial driving.  Tr. 29-32.

6.  Murphy is unable to perform any past relevant work.  Tr. 32-33.

---

corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[7] The ALJ's findings are summarized.

7.  Murphy was born in 1973 and was 42 years old, defined as a younger individual age 18-44, on the alleged disability onset date.  Tr. 33.

8.  Murphy has at least a high school education and is able to communicate in English.  Tr. 33.

9.  Transferability of job skills is not material to the determination of disability.  Tr. 33.

10. Considering Murphy's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Murphy can perform, including order clerk, document preparer, and touch-up screener.  Tr. 33-34.

Based on the foregoing, the ALJ determined that Murphy had not been under a disability, as defined in the Social Security Act, from September 30, 2015, through the date of the decision. Tr. 34.

## V. Law & Analysis

### A.  Standard of review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**B.      The undersigned recommends that the Court AFFIRM the Commissioner's decision**

Murphy argues that the ALJ erred in his evaluation of the August 2016 opinion of his treating primary care physician, Dr. Ridgel, and the August 2017 opinion of his treating rheumatologist, Dr. Mathai.[8]  Doc. 12, pp, 12-18, Doc. 16, pp. 1-9.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for the weight he assigns to the opinion.  *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544; *Cole v. Comm'r of Soc. Sec.*, 661 F.3d 931, 937 (6th Cir. 2011).  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment

---

[8] There is another opinion in the record from Dr. Mathai, which is dated February 2017.  Tr. 1571.  Murphy does not challenge the ALJ's evaluation of Dr. Mathai's February 2017 opinion.  Doc. 16, p. 2.

relationship and the frequency of the examination, (2) the nature and extent of the treatment

relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the

record as a whole, (5) the specialization of the source, and (6) any other factors that tend to

support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir.

2007); 20 C.F.R. § 404.1527(c).

An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors

considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed.

Appx. 802, 804 (6th Cir. 2011).  However, the "good reasons must be supported by the evidence

in the case record, and must be sufficiently specific to make clear to any subsequent reviewers

the weight the adjudicator gave to the treating source's medical opinion and the reasons for that

weight."  *Cole*, 661 F.3d at 937 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, at *12

(Soc. Sec. Admin. July 2, 1996)) (internal quotations omitted).   The "procedural 'good reasons'

rule serves both to ensure the adequacy of review and to permit the claimant to understand the

disposition of [her] case."  *Miller v. Berryhill*, 2018 WL 3043297, * 7 (E.D.Mich., May 29,

2018)(quoting *Friend v. Comm'r of Soc. Sec.*, 375 Fed.Appx. 543, 550-51 (6th Cir. 2010)),

*report and recommendation adopted*, 2018 WL 3036340 (June 19, 2018).

The ALJ explained the weight assigned to Dr. Ridgel's August 2016 opinion and Dr.

Mathai's August 2017 opinion wherein Dr. Mathai indicated she agreed with Dr. Ridgel's

August 2016 opinion, stating:

> The undersigned considers and gives little weight to the opinion of treating
> physician, Jason Ridgel, M.D., who opined on August 24, 2016, that the claimant
> is limited to less than a full range of sedentary work (Ex. 21F). Dr. Ridgel further
> opined that the claimant could stand/walk for a total of one hour in an 8-hour day
> and that she must change position frequently (Id).  While Dr. Ridgel is a treating
> source with familiarity with the claimant's impairments, the undersigned finds that
> this opinion is not generally consistent with the medical evidence of record, which
> supports generally mild findings.  The undersigned notes that treating physician,

> Dr.  Mathai concurred with Dr. Ridgel's opinion on August 14, 2017 (Ex. 32F). This opinion is evaluated in the same light as Dr. Ridgel's.  Accordingly, these opinions are afforded little weight.

Tr. 32.

As noted by the ALJ, Drs. Ridgel and Mathai's opinion restricted Murphy to less than a full range of sedentary work, including being able to stand/walk for only 1 hour total in an 8-hour period.  Tr. 32.  The ALJ found the physicians' restrictive opinions were entitled to little weight.  Tr. 32.  As the ALJ explained, the opinions were not generally consistent with the medical evidence of record, which supported generally mild findings.  Tr. 32.  Murphy has not shown that the ALJ's finding regarding there being generally mild findings throughout the medical records is unsupported by substantial evidence.  She argues that the ALJ did not satisfy the treating physician rule and did not consider all of the regulatory factors when weighing the medical opinions.  However, the undersigned finds that the ALJ's decision is sufficiently clear to allow for meaningful review to assess whether the ALJ's weighing of the opinion evidence is supported by substantial evidence and the ALJ satisfied the treating physician rule.

As indicated above, an ALJ is not required to provide "an exhaustive factor-by-factor analysis" of the factors that the regulations instruct and ALJ to consider when weighing medical opinions.  *See Francis*, 414 Fed. Appx. at 804.  Here, the ALJ recognized that Drs. Ridgel and Mathai were treating physicians and considered the consistency of the opinions with other evidence of record.  Thus, even though other factors were not specifically discussed, e.g., Dr. Mathai's specialty or length of treatment relationship that the doctors had with Murphy, Murphy has not shown that that lack of discussion warrants reversal.

While the ALJ did not specifically acknowledge that Dr. Ridgel stated that the limitations contained in his opinion were based on Murphy's pain, fatigue and weakness, the ALJ explained

in the opinion that he found Murphy's subjective complaints of pain and fatigue were not entirely consistent with the medical evidence and other evidence in the record.  Tr. 30-31, 32. When assessing the credibility of Murphy's subjective allegations, the ALJ discussed medical examination findings showing normal range of motion, no pain, no distress as well as Murphy's various daily activities, such as her ability to prepare complete meals with several courses that took 1-2 hours and her ability to attend her son's school activities.  Tr. 27, 30, 32, 301-303, 703.

Also, while the ALJ did not specifically mention Murphy's daily activities when weighing Dr. Ridgel's August 2016 opinion and Dr. Mathai's August 2017, the ALJ did discount Dr. Mathai's February 2017 opinion in part because it was not supported by Murphy's own statements regarding her daily activities.  Tr. 32.  Recognizing that Murphy is not challenging the ALJ's weighing of Dr. Mathai's February 2017 opinion, the undersigned finds that the ALJ's consideration of that opinion is not entirely irrelevant to assessing whether the ALJ's decision to assign little weight to Dr. Mathai's opinion from August 2017 is supported by substantial evidence.  In February 2017, Dr. Mathai stated that Murphy was unable to work.  A few months later, without commentary, Dr. Mathai concurred with Dr. Ridgel's August 2016 opinion.  Both opinions, which are severely limiting, were found by the ALJ to be unsupported by and not consistent with the evidence.

Murphy contends that the ALJ did not take into account the consistency of Dr. Ridgel's and Dr. Mathai's opinions.  However, the ALJ did acknowledge that Dr. Mathai agreed with Dr. Ridgel.  Thus, the ALJ was fully aware they were consistent with each other but concluded that the opinions were entitled to little weight.

Murphy also contends that the ALJ failed to consider the entirety of the opinions because he did not specifically reference the opinions regarding absences per month or the lifting and

26

carry restrictions.  This is not a case where the ALJ ignored opinions.  Rather, the ALJ

considered the treating physicians' opinions, recognized that the opinions limited Murphy to less

than a full range of sedentary work, weighed those opinions, and explained his reasons for

assigning little weight to them.

In her Reply brief, Murphy argues that, because objective tests are not highly relevant to

diagnosing or assessing fibromyalgia, it was not appropriate for the ALJ to rely on the absence of

objective findings to support his decision.  However, the ALJ did not rely solely on the absence

of objective findings in reaching his decision.  As discussed above, the ALJ considered

Murphy's subjective complaints of pain and fatigue.  Tr. 29-31.  Further, the ALJ considered the

state agency reviewing physicians' opinions.  Tr. 31.  And, when considering and weighing those

opinions, the ALJ took into account Murphy's persistent complaints of joint and muscle pain

when deciding to assign little weight to the portion of the opinions regarding light exertional

work.  Tr. 31.  As reflected in the decision, the ALJ assessed a more restrictive RFC, i.e.,

sedentary, rather than light as opined by state agency reviewing physicians.  Tr. 29, 31.  Thus,

the ALJ did not disregard subjective complaints.  Rather, the ALJ weighed the entirety of the

evidence, including Murphy's subjective complaints.

Having reviewed the ALJ's decision, the undersigned concludes that the ALJ satisfied the

treating physician rule when weighing the medical opinion evidence.   Murphy has not shown

that the ALJ's decision to discount her treating physicians' opinions because they were not

consistent with the medical record of evidence, which generally showed mild findings, was not a

good reason.  Further, she has not shown that the ALJ's decision is not supported by substantial

evidence.  Accordingly, the undersigned recommends that the Court AFFIRM the

Commissioner's decision.

## VI. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

October 3, 2019

/s/ Kathleen B. Burke
_____
Kathleen B. Burke
United States Magistrate Judge


## <u>OBJECTIONS</u>

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).